Good morning your honor. My name is Andrea Lyon and I represent Jerry Gillespie. Good morning your honor. Andrew Levine, L.E.B.I.N.E. Special Assistant State's Attorney representing the people of the state of Illinois, also with Mayor Miles P. O'Rourke, also on behalf of the state. Each side is 15 minutes but we don't look at our watches so why don't you keep it interesting and move along. We do have a very long history of this case so it might take longer. So just keep it interesting, keep it moving and hit your strongest points. Whenever you're ready. And you'll have plenty of time professor to reply. I ask both sides to keep your voices up. That's not usually a problem for me. If anything people are telling me to be more quiet. Good morning your honors. My name is Andrea Lyon. As I said and I have the privilege of representing Jerry Gillespie. I intend to combine my remarks primarily to issue 1A, the Brady issue, and to issue 2 which has to do with ineffective assistance of counsel as those issues connect to each other. Of course I'm happy to answer any questions that you might have about any of the other issues. And thank you Justice Quinn for saying I will have some time for rebuttal. I appreciate that. But I think that before I begin on the substance here that I think it would make sense to just talk a little bit about the procedural knot that this case is in. Because of the many filings prior to my clinic becoming involved in the case and the issues that arise because their successor filings and multiple filings including one pro se filing. And I think that the way to cut that knot and what the courts tell us that we should do is that we take a look at whether there is credible evidence of actual innocence which allows us to reach the constitutional issues that are presented to the court. Now we do raise of course an actual innocence issue which I'm not planning to argue in understanding how much time we have. But that is the way that we can get to the underlying issues which are in our view the important issues in this case. And the case of People v. Ortiz which is a fairly recent decision, about a year old I guess by now, tells us that we can do that. And so I wanted to just at least speak to the fact that this has a long procedural history and that this is why we believe that it is appropriate to deal with the merits of the issues before this court. I couldn't agree more. If I can ask you what are you basing the actual innocence claim on? What new evidence do we have that would indicate there is a legitimate or a colorable actual innocence claim? There are a number of things. One of which I'm going to spend some time talking about is connected to the Brady claim which is John L. Alexander's testimony. So that's one thing. There is the confessions under oath of two of the three actual killers who exculpate Mr. Gillespie, one of whom is doing time, one of whom is, well, one of whom has been subsequently arrested if you're interested for another murder. And as well as the evidence that was not available in a presentable form at the time of Mr. Gillespie's trial having to do with the sad history of police torture of some small group of police officers here in Chicago. So all of those things combined give us a colorable and we believe a strong innocence claim. Go right ahead. I just wanted to learn where it was coming from. Okay. And so what I wanted to talk to you is about John L. Alexander. Okay. Now, if I'm telling you things that you already know and I'm boring you, stop me. But basically this case, there was a state theory, a prosecution theory. And the prosecution theory was this was a revenge killing of Mr. Rogers that it was arranged for and planned by a guy named John L. Alexander who assigned people to certain roles, the shooters to their roles and our client Mr. Gillespie to a role as a lookout. Okay. And that's what, you know, is their theory. And that's what they argued. That's what they talked about. That's what was testified about. That was their theory. Unbeknownst to Mr. Gillespie, at the time of his trial, the police had actually interviewed John L. Alexander. And not only interviewed him, they had him in custody for three days. And questioned him extensively. And Mr. Gillespie only knew John L. Alexander by a nickname. KB didn't know that the two connected to each other? KB or Pete? It testified on cross. Mr. Gillespie did. Yes. That KB is Pete. Pete and KB are both names for John L. Alexander. And on cross he identified a photograph of John L. Alexander as being both KB and Pete. Right. He didn't know that until he was shown the photograph that those things connected. But you're right. And that's why these issues connect. That is the issue of the Brady violation and the ineffective assistance of counsel. Because one way or the other, Mr. Gillespie and this jury were cheated. They did not hear the whole story. And they should have. But in his confession, and again, that's not in the records. The only thing that's not in the records is his court report or how it was memorialized. His last statement, let's call it. He says John L. Alexander did this. And let's assume you're right. He was torturing him. That's a lie. But certainly he, Gillespie, knows about John L's alleged involvement in this. Because he said he was involved in it. And that he's one of the sources of the information, theoretically, even if it came from the police, that John L. Alexander is up to his eyeballs in this. He's the one who ordered it. He referred to him as KB. But what he didn't know, though, what he didn't know was that the police had, in fact, interviewed him and had him there for three days and that John L. Alexander said this didn't happen. None of this ever happened. There was no plot. There was no plan. There were no orders. I didn't do anything. You know, this was a shooting in revenge for the shooting of the brother by Rogers. And that's what John L. Alexander said to the police. And I should note that one of the odd things about this, you know, Justice Quinn, I know you were a prosecutor for a long time. And I don't know if you've ever run into this, but I certainly haven't, was that there were three homicides that occurred in a short period of time in the same neighborhood. And all of them were under the same R.D. number. I didn't know they were under the same R.D. I'm familiar because I think I had those cases as well. Yeah, but they were under the same R.D. number, which for those of you who are not necessarily familiar with how the police department works, usually there's a record department number that attaches to one case. So there's a homicide of A, and he gets an R.D. number, and B, and he gets an R.D. number. And they may end up having some crossover in their investigation, but each of them have their own sets of police reports. The reason that this might be important is that the police reports were voluminous and confusing as to who was being talked to about what. And so that might also be important. But what is also should be noted is there is no summary in the police reports anywhere, any indication other than the name John L. Alexander, as to what he said or that he was interviewed or certainly not that he spent three days in custody. And I would just note that for the purposes of this motion to dismiss by the prosecution, we have to, you know, the court is to accept well-pleaded facts as true. Obviously, you know, if John L. Alexander testifies and his credibility is attacked in some other way, that would be a different situation, but that has not happened. But he's not in his affidavit Alexander now. It does not say he was present at the scene. He's not an alibi witness for Mr. Gillespie. Indeed, his alibi, Alexander's alibi now, is in direct contradiction to Gillespie's testimony. Actually, I would take issue with that, but that's okay. There are some inconsistencies. I don't disagree with you. And that's the kind of thing that juries do all the time. In this case, I mean, Mr. Gillespie testifies at his own trial and says that shortly after the shooting, which he didn't really know about, he arrives in a neighborhood right around the corner from where the shooting occurred in this beauty parlor, and he saw KBP John L. Alexander, who told him, there's just been a shooting. You guys better go home. You know how those police are. And then an affidavit is filed a decade later or so from John L. saying, I stayed with my girlfriend at 68th and Wood the whole day and whole night. So I don't know what you're talking about. Well, I think it's not as clear, but certainly the prosecution's position. I'm going to read it to you, actually, that Gillespie's testimony is contradictory to John L.'s because he testified that the night of the murder, Pete told him what happened and told him to go home. That's at H114. On cross, Gillespie seems to say that Pete was KB, but it isn't entirely clear with all the names in the form of the questioning whether the Pete that he saw is the same Pete or just another guy named Pete, and that's at H144. So one could make an argument either way, certainly, and that would be something the prosecution would be able to present at trial. But that's why we have trials, right? So if that was going to help Mr. Gillespie, the time to do that is when he's testifying about Pete KB, John L. Alexander. And you can rightly argue, Professor, that from this you could infer something different. That perhaps another Pete was just driving, they're not related. Even though he's shown a photo, is this Pete? Yes, that's Pete. And that's right after he testifies about Pete. And he goes, and you know him as KB and you know him as John L. as one of the leaders of the Gangster Disciples, et cetera. You could argue that, but that's to the jury that day, not to the court 17 years later saying, ah, you know, it's possible there's a different Pete. Well, you asked me that question, but the point of our argument here is that John L. Alexander gave exculpatory information to the police during their investigation and they hid it. They chose not to write it down. They chose, and one could argue, and I... Do we have a copy of the police report? That's the argument now. If the argument is... You have a copy of the police report. Based on the statements of, I'm sorry, John L., that there's nothing in the RD which indicates that Alexander picked up an interview. I take that as true. His name is mentioned, just nothing about the actual interview. No summary. But then his interview, let's assume his interview is consistent with what his affidavit is, which is I had nothing to do with it. I was at 68th and Wood for that whole 24 hours. How does that help your client? Other than saying your client, it disagrees with your client in a sense. But it does take apart the state's theory. The state's theory is John Alexander is the mastermind. He's the one who organized everything. He's the one who told Jerry and everybody else what they're supposed to do. And he is saying that didn't happen. And that is exculpatory information, and I'm sure if the prosecution, the prosecutors knew about it, they would have turned it over, but they didn't. But either way you look at it, Justice Quinn, if this is something that should have been investigated and should have been presented at the time of trial, and I certainly would have followed it up, I have to say. I think you would. Okay. You know, we've tried cases against each other, and I certainly would have. You are very thorough. But then, you know, either way you look at it, then it's ineffective assistance of counsel not to have done that because this testimony is highly relevant. The jury is trying to make a decision as to whether there was a plot, whether there was a plan. And John L. Alexander's testimony, and it may have been if his lawyer had interviewed John L. Alexander and had made a decision for strategic reasons not to call him, that would be a different situation. But we don't have an ineffective assistance in front of us. Yes, you do. I'm sorry, there is. How do you know the first status of Strickland, though, where you say the first step of Strickland is whether or not an experienced lawyer would have done what you're saying he should have done, which is to interview John L. and call John L. In this case, and again, you've tried many more murders than I have, hundreds, I dare say, Professor. 136. How much was it? 136. It didn't wear you down at all. So 136 murders, maybe a little bit. But of the 136 murders, how often are you going to call the head of the gang to say, I did not direct that underling to commit that murder? I mean, I don't know if I've ever seen that. I did it for 16 years. I don't recall ever somebody, a defense attorney, calling the leader of a gang. I did it recently. Okay, well, you try to do it now. But I will make a trial. No, I'm saying I did it recently in a trial. You're right. There would be strategic decisions that need to be made. But you cannot make a strategic decision in the absence of information. And if you don't go and do the interview and the police choose not to write down what the interview revealed, and this wasn't like I'd stop him on the street and I'd say, you know anything about it? And he says, no, and off you go. This is he's in custody for three days where he observes somebody else who has been physically abused, where he, you know, says that he was essentially threatened or he felt he was threatened. All those kinds of things. If we go back then to the, say, so you have the actual innocence claim. And so let's go back then to the procedural problems you have, is that this was raised at trial. You know, a brutality allegation was raised at trial. Janelle's involvement was brought up at trial through your client's confession. You cut ahead then to the first PC, which didn't complain about Janelle Alexander. The amended PC, which complained about the police, I'd suggest in an identical manner as the direct appeal, but not Janelle. The third PC, which we ruled on then and pointed out, as you point out, in your fifth PC, the one you filed. I'd suggest it's a fifth. I'm just trying to get the numbers because one's an amended, one's a pro se. But the fifth one in time is yours. And in the third one, which we addressed substantively, or pretty much substantively, we pointed out those are the same allegations in the third PC against Foley now, the investigator, as were at trial and in the first PC. So now you have the fourth PC filed by Cunliffe, which has the same allegations but includes the Area 2 stuff, which was included in the third PC. And now we have your fifth PC. How do you get around the bars of res judicata? Doesn't this end at some point? What do you have to get over the res judicata? I mean, I addressed that in the beginning, and it is our position that this procedural not gets cut by actual innocence. But I understand. On the Foley, because you bring in Janelle Alexander that starts everything all over again, you can now say that Foley, you have a Brady claim in front of us today on Foley, the investigators, and the res judicata doesn't apply because you came up with a new witness to say the confession wasn't true? Is that how that works? Justice Quinn, what I would like to tell you is that the law is clear on this. And I'm afraid I cannot tell you that the law is clear on this. And the reason that I cannot is that cases have been decided both ways. That is, where new evidence is introduced to an issue that's been previously raised, it is not considered, because it's de horsa record, it's not considered to be res judicata. But in a successor situation, which this is what we're in, in a successor situation, there are cases that go both ways. And I wish I could tell you that there's a clear line that if, you know, if you bring in one new person, that's enough or not enough, or that there was a clear line about how to do this. But when you're talking about a constitutional issue, which is a Brady issue, and when you're talking about matters that were known to the police department and which were not made available to defense counsel at the time of trial or at the time of the motion, then what you are talking about is an incomplete and, you know, inaccurate fact finding as a result of that. And I wish I could say to you, people versus such and such answers that question. And, you know, there's cases that we cite, cases that the state cites. And, you know, I've read all the cases, I think. I tried. You know, I tried. And I cannot tell you that there's a clear answer regarding essentially more evidence of Brady later on, which I think is a fair way to characterize the new facts that we brought forth. And just in case this was not procedurally complex enough, I don't know if you know, but if you don't, I would like to tell you that there is a habeas petition in front of Judge Korr that's been stayed and obeyed in order for us to go back to state court. So just in case there weren't enough procedural things. The only interesting thing is we had the fourth and fifth cases in front of us. And it's not the fourth res judicata, it's the fifth. Even though I stayed at the request of the defense, the appeal of the fourth until the fifth was done. And here's the reason that that happened. When Ms. Kumla became ill and I was contacted to come over and take over the case, and I asked Judge Ford for time to complete the investigation and be in front of him and do one petition and he wouldn't do it. So I was kind of in the position of having to file another one, which would not have been our choice. But it would not have been our choice to file another one. But that's the reason that that happened. I understand that makes perfect sense, Professor. My concern, though, is in the area of res judicata, that I'm concerned for your position in that the fourth one is lost. Then how do we raise issues in the fifth when the fourth was lost, even though we haven't lost an appeal on it yet? And there are new facts that were presented in the fourth and new facts that are presented in the fifth, which we, it is our position that the actual innocence allows us to raise these issues and gets us out of the res judicata problem. But I cannot tell you honestly here, Justice Quinn, that there is no question about that issue because the law is just all over the place. But what happened here, though, the status, the procedural status of the fourth and the fifth, at least let's start with the fourth. Did Judge Ford allow the successive petition to be filed? No. Okay, so he denied it. I won't let you file it. So it wasn't denied. No, no. It was filed. He dismissed it. I'm sorry. Correct. Right. So to my point, he dismissed it without any evidence you're hearing, even though John Ellis said something on the record. No, no. John Ellis said nothing. He had not been talked to in the fourth petition. It wasn't until we went and did the investigation that we found all this. So then on the fifth one, how was that disposed of? There was a motion to dismiss by my colleagues here, and that motion was granted. John L. Alexander was brought into court and averred to the habeas and corrected a type of, excuse me, averred to the affidavit and corrected an error that was in it. But there was not an actual hearing as such. But, again, the petition was allowed to be filed. No evidentiary hearing was held other than a submission. There was no cross. It was just he averred to something. And there's also, you know, the order actually dismissed the 214-01 and denied us leave to file the successor. That's what the order actually did. So the order dismissed the 214-01 petition and denied us leave to file a successor petition. Okay. And the order by Judge Ford, I think, just simply denied the right to file a successor. The order was not quite as clear as Judge Sachs' order was. Okay. So I think I've sort of covered what I intended to cover. I wanted to make sure that I'm answering any of the questions that, you know, Justice Murphy or Justice Steele that you might have. If you find any left out, we'll let you go. Okay. Well, I appreciate that. I do want to end by saying this. You know, I know that there's a lot that has been written about the trial being the main event and that that's where things should happen and that, you know, shouldn't there be an end at some point? I think you've been asked that question, Justice Quinn, to litigation. And it has been our experience here in this state and in other states that grievous wrongs have occurred with nobody's bad intentions here. Nobody is saying that. But grievous wrongs have occurred and people have been wrongfully convicted, and we found it out much, much later. And it is our position that the evidence that we have uncovered shows a pattern of behavior by the police, not just in terms of how they treated Mr. Gillespie, but how they treated exculpatory evidence by hiding it basically from the prosecutors, by not writing it down, that there was a perfect storm here of ineffective assistance of counsel and failure to do an adequate investigation, frankly, until the clinic got involved, you know, over a year ago, and that all of this has conspired to do two things. One is to see that Jerry Gillespie did not get a fair trial and is very likely, it is our position, actually innocent of this crime. And two, that the jury didn't get to hear the whole story. And that's not fair either. That's not good either. That's not good for the system either. And for all these reasons, we ask that you reverse the trial court. Thank you. Do you have time for your final question? Yes. Could you please tell me, just in a little paragraph, how you relate the police violence from Area 2 to Area 1? Some of the same police officers, sir, that were at Area 2 then went to Area 1. Some of the same police officers, including Foley. I saw that. Yeah. That's it? They did some of the same things at Area 1 that they were doing at Area 2. Some of the police officers. And I don't mean to, you know, paint with a broad brush and say everybody is like this because everybody is not. So was Foley ever convicted or what happened to him? He is presently under investigation and taking the Fifth. That's what I know. I don't know more than that. I think every policeman who is 2 is taking the Fifth. Otherwise, they'll be dragged into 219. Yeah, that's my understanding. But, you know, that's just, I think, in the category of legal gossip. All right. But accurate. Okay. Thank you. Special Prosecutor. Thank you very much, Justices. Before we start, how did Mr. Noodleman's office get on this case? It's not an Area 2 case. It's not an Area 2 case. We were appointed to this case, and it's actually contributed to some of the procedural problems that we have in this case, is that we were actually appointed on June 28th of 2009. The original petition that was in front of Judge Ford had already been filed and ruled upon prior to our getting involved in it. So we have interpreted our order appointing us to the Gillespie matter, which was in front of Judge Sachs, as including, since there's been a consolidation on appeal, giving us the authority to stand here and address both. But it was certainly something that we had, one of the first things we had addressed is our right to be here. Okay. I think I would address a couple of issues and respond to a few of the points that the counsel made and certainly answer any questions that you have. There is a procedural knot, but the procedural knot that we have was not created by us. It was created by the petitioner. As Your Honor, as Justice Quinn correctly pointed out, this is, depending if you count the original pro se petition as one and the amended as the second one, this is either the fifth or fourth PC, and there was an intervening habeas petition filed in 2005 as well. The problem is that the petition that was filed in front of Judge Ford, and we did raise this argument to Judge Sachs, is that the petition filed before Judge Ford was a 1401 successor, which we believe the issues were identical in terms of the merits that were raised before Judge Sachs. So we contended before Judge Sachs that he did not have jurisdiction because the filing and the notice of appeal divested the trial court of jurisdiction to reconsider the merits of the issues that were on appeal. It is, and I don't believe that I even need to, it doesn't have to be the state's characterization of those pleadings. I would reference this court to the petitioner's characterization of it with the pleading that was filed on May 7, 2010 with this court. That was a petition called Motion to Lift Stay, Consolidate Appeals, and File Brief and Standard. At paragraph three of the motion that petitioner filed with this court, he characterized the petitions and said the only difference between the issues and the two petitions was the addition of a fourth claim in the second petition contending post-conviction counsel was ineffective for failing to locate certain witnesses. So I think that that also goes to your questions about res judicata and the effect of the Judge Ford ruling. They've admitted that they are identical except for the 651 claim as it relates to post-conviction counsel. So I think that we have that appeal in front of us as well. I did grant consolidation, so we have the fourth as well. Exactly. It is definitely before you because it was consolidated, but it was an issue that we raised before Judge Sachs, and I think that it raises potential problems when you have the issues on appeal and the same issues being litigated. You certainly have a risk of inconsistent verdicts. And in this case, I think that it even raised somewhat of a different problem is that essentially what it was is that under petitioner's logic, if it was an appropriate filing, the identical claims could be filed. If the trial court denied relief, it could be appealed, filed seeking to consolidate it. While the appeal is pending, she could move to stay the appeal, go back before another judge, as Your Honor indicated, where there should be some finality, file a sixth successive, a sixth PC, seeking to get different redress from another trial court. And if that trial judge were to grant the relief they wanted, then they could just dismiss the appeal. And that was what was represented to this court is that it would moot out the pending appeal. So I think that that was a jurisdictional problem. Why did it go to Sachs instead of Ford? I don't know, Judge. Okay. The whole thing is bizarre, frankly. I don't know the answer to that. We were appointed, obviously, it was already on June 28th, and at that point we were already in front of Judge Sachs. So we had never appeared before Judge Ford. But even if we were to assume that the trial court did have jurisdiction, which we contended it did, I think that there's not a proper 1401 petition. And I'd like to briefly address that, and then I'll get to the Jonelle Alexander and the Brady violations. You don't need to address the 1401. All right. With respect to the – I will heed Your Honor's advice. Thank you. They didn't argue it, so don't worry about it. Okay. I think that there was just an issue of whether or not the freestanding claim of actual innocence was properly brought as a 1401 petition, as opposed to being brought as a PC. Don't misunderstand me. I'm not forfeiting Professor Lyons' brief on it. I'm just saying don't argue it. Very good. I will get to the, I believe, what counsel addressed and I think what Your Justice's questions were directed to, and primarily the res judicata and the Brady claims as they relate to Jonelle Alexander. You know, there are multiple affidavits that are submitted. I think it's evident from the argument, and I believe evident from the briefs submitted and the arguments before Judge Sacks, that Jonelle Alexander sort of interweaves all those issues. He goes to the ineffective assistance claim. He goes to the Brady violation. He goes to the actual innocence. He really goes to all of the issues. And a common theme with respect to Jonelle Alexander is whether they knew about it and whether there was disclosure. And I think that a simple review of the trial record indicates, and I think that Justice Quinn pointed several of these things out, and there are several others that I would like to point out. There is absolutely clear that, number one, the statement of Jonelle Alexander does not exculpate Mr. Gillespie in any way. And even more abundantly clear from the record is that they knew about him, and they knew about him at the time of trial. The opening statement from the state's attorney referred to KB, Jonelle Alexander. Detective McDowell identified KB and Jonelle Alexander as being the same. The assistant state's attorney, Nelson, identified KB as Jonelle Alexander. Detective Halloran identified KB as Jonelle Alexander. Mr. Gillespie, the petitioner, testified at trial. He indicated that he knew Jonelle Alexander, but he knew him as Pete, not as KB. He was questioned with regard to that, and the question was with respect to, I believe this is supplemental record 586, the attorney was showing him the photograph of People's Exhibit No. 37. He said, do you see KB in the center of this photograph? Do you not, sir? Answer, Pete. I see Pete. Question, Pete, that's Jonelle Alexander, the guy you call Pete, also known as KB, right? Answer, right. His alibi witness, Mr. Parks, also testified regarding that photograph. Mr. Parks was shown the photograph, and Mr. Parks identified Jonelle Alexander in the photograph, but he identified him as KB. So Mr. Gillespie knew him as Pete. There he is in the photograph, Jonelle Alexander. Mr. Parks knew him as KB. There he is in the photograph. So I don't think there's any reasonable interpretation of the trial proceedings that can be said that they did not have awareness of him at trial. And it's certainly clear, I think, from the testimony. Also, in his court-reported confession, or however it was memorialized, Mr. Gillespie said he was ordered to do this by Jonelle. And again, I just want to point out to you, counsel, I was going to yell at the state's attorneys, but since you're a private counsel, I'll yell at you too. It helps when the issue is whether or not the voluntariness of a confession to include the confession, which we don't have in front of us. It's odd. So if that's the issue, it's one of the issues here, it would be helpful the next time you work on these, if you're going to be working on these, and apparently you are, you're a firm, have the confession in there. If that's the rabbit, that's the beef. Have it in there. Go ahead. I believe the statement is part of the record. I can try to get the citation for it, Your Honor, but I'll certainly take that warning. Advice. Advice. Thank you. I'll address the Brady violation as sort of part and parcel of that. Certainly the knowledge of Jonelle Alexander, I believe, is evident. The determination of whether it needs to be disclosed, certainly there's no dispute that the state has an affirmative duty to disclose its co-operatory material, but the standards of the information has to be material, and there needs to be a reasonable probability that the disclosure of evidence would have altered the outcome at trial. I believe that Judge Sachs correctly found that the statement of Jonelle Alexander did not exculpate the petitioner in any way, and found that even if it was disclosed, it would not have affected the outcome of trial. His statement is simply his denial of his involvement. He does not offer any facts that contradict the statement, voluntary statement, of Jerry Gillespie. So I think that the analysis by the trial court in that regard was absolutely correct. It also is, as counsel pointed out, it was not an after-the-fact effort by the court to say, well, it was sound trial strategy to not call Jonelle Alexander. This isn't something that the court created. It was the actual trial strategy utilized by defense counsel at trial, and I would direct the court's attention to the closing statement of counsel for Mr. Gillespie. He got a closing statement, and he attacked the indictment. He attacked the indictment in saying, where's the organizer? The person who organized this entire plan is not in this indictment. Our case, the state's case, Justices, I don't believe rose and fall on whether or not Jonelle Alexander acted as the organizer and provided this plan. It is absolutely unrefutable that there was a plan. If there wasn't a plan, you've got six people who showed up at the same place at the same time, on the same day, with guns, wearing masks, to execute the same person as a simple coincidence. And I don't think that it is any reasonable interpretation of the trial testimony or the record in this case can come to the conclusion that there wasn't a plan. Whether Jonelle Alexander orchestrated it or not, they were free to believe, the jury was free to believe that he did and free to not believe that he organized it. And certainly they argued at closing that, you know, had he been the plan and the organizer, he would have been in the indictment. So if you don't believe that, then you can't believe the statement claiming that he was the, in fact, organizer of it. Well, one of the problems, of course, with the case is that there's only witnesses for three of them. Nobody says there were lookouts outside. And then among the guys who confessed and most of them confessed, they didn't point the finger at the same people doing the same job. Exactly. And I could certainly, I will go through, I could go through with you, with Justices, if it would help, each of the affidavits. No. But they in no way do the affidavits say or support the theory that they are advancing. They have no personal knowledge in most instances. And they are inconsistent with each other in many, many ways. And certainly Molstad doesn't save them. They certainly have knowledge of them. They were all in the same gang. And they admit that in their affidavit. So they certainly knew each other. In any form of diligence, they would have discovered it. And they're certainly not new in any sense. I would answer any questions that Justices have. I had much more, but I limited it sort of to what counsel said. We appreciate that. No. Thank you very much. Thank you very much. Professor, briefly. Your Honor, Justice Quinn, the statement was one of those written statements where Okay, handwritten. It was a handwritten statement where they crossed out because originally he said there was a person in a blue coat and every witness said it was a black coat. I think we pointed that out in the record. And the police reports are Was that the final one, though, or was that being That was it. Okay. And that is in our supplemental exhibits. But I can't tell you exactly where it is right this minute. I couldn't find it. Okay. First of all, I do want to say that the testimony of the detective regarding John L. came close. And I just ask, Your Honor, take a look at page M231. It comes awfully close to a lie by omission, let's put it like that. And just look at it for yourself in terms of when he's asked questions about Mr. Alexander. Secondly, while in our motion we did indicate that issues were similar and the legal issues were the same, of course we are presenting new facts. And again, it's our position that when you present new facts that there's a reason to consider both petitions because the facts that were in front of Judge Ford were added to and would have been added to in an amendment if I'd been allowed to do that. So I think that that part of things, and the parade of horribles that the prosecution just talked about where, you know, I'm just going to constantly file more post-convictions like until, you know, I'm 80 or something. Not you, him. Well, you know, no. That's not going to happen. Well, he's already done it. He's got a writ down the street. Well, that writ was stayed and obeyed to send us back to, to send him back to state court. That was the reason for it because the confession, which I must disagree with my colleague here, which of Sixpoint, who is the actual shooter, does totally exculpate Jerry Gillespie, says that there was a plan with the three of them that Jerry Gillespie had nothing to do with it, that John L. Alexander had nothing to do with it. And in fact, actually, it's the closest thing to a bragging confession I've ever seen. He was quite irritated that the medical examiner had not drawn the six shots that he put in the man's head to show the accuracy of the shooting. Seriously. So I have to take issue that that is not exculpatory. In fact, it is. And the other part of this is that the prosecution argues to you that due diligence should have turned up John L. Alexander. Well, if that's their position, then he didn't receive effective assistance of counsel. Due diligence should have. I agree. Due diligence should have. But it is also true that John L. Alexander said that he spent three days in the police custody telling them that there was no such plan, that these three guys, that the shooting was on their own, according to what he'd heard on the street. He said that. And they didn't write it down. Can you address the closing argument of defense counsel for Mr. Gillespie? Where is J.A.? He wouldn't be able to say that if he called J.A. That's true. He wouldn't be able to say that. But he didn't know what John L. had said because it didn't get written down. And he didn't investigate it. And that does raise another issue, which is that if, in fact, John L. or Jerry Gillespie's statement was correct, the truth, which he says it's not, and we say it's not, but if it were, and the police believed that it was true, and he's a lookout, and John L. Alexander is the person who put the whole thing together, it seems odd that they wouldn't use Jerry Gillespie with no record as a witness if that's what they, in fact, believed. But that's more of a trial sort of argument. I agree. And what I want to say is this. Yes, there have been a lot of petitions. I wish that a proper investigation had been done before the first one was filed. And I promise you that if we'd been involved, it would have been. But it wasn't. And that's why we raised the 651C claim, which to talk about the failure of post-conviction counsel to do the kind of investigation that needs to be done in post-conviction. And this is the standard of practice now. It might not have been 20 years ago before when people sort of thought of post-conviction as kind of like an extra appeal or something where you can just sort of talk about the Constitution. You know, the standard of practice is that you reinvestigate the case from the ground up. That's how we have had the exonerations that we have. And that was not done in this case until we came in. And for all those reasons, we ask that this Court reverse the trial court and give Jerry Gillespie a fair trial. Thank you. I apologize to you, Counsel, for complaining about the evidence that was currently in the supplemental. I should have found it. This case will be taken under advisement, and this Court will be adjourned. Thank you so much.